IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

PAULETTE BARRY,

    Plaintiff,

vs.                                                        CASE NO. 1:13-cv-89-MP-GRJ

CAROLYN W. COLVIN,
Acting Commissioner of Social Security,

    Defendant.

_____/

## REPORT AND RECOMMENDATION

Plaintiff appeals to this Court from a final decision of the Commissioner of Social Security (the "Commissioner") denying Plaintiff's applications for a period of disability and disability insurance benefits (DIB).  Doc. 1.  The Commissioner has answered, Doc. 9, and both parties have filed briefs outlining their respective positions.  Docs. 17, 22, & 23.  For the reasons discussed below, the Commissioner's decision should be affirmed.

## I. PROCEDURAL HISTORY

Plaintiff applied for a period of disability and DIB on August 13, 2009, alleging disability since July 16, 2009.  (R. 1162-63, 188-90.)   Her applications were denied initially and upon reconsideration.  (R.104-14.)  A hearing was held before an Administrative Law Judge (ALJ) on March 9, 2011. At the hearing the Plaintiff, a medical expert, and a vocational expert (VE) testified.  (R. 35-103.)  The ALJ denied Plaintiff's claims in a decision dated April 21, 2011, finding that although Plaintiff suffered from the severe impairments of history of arthalgias, history of osteoporosis of the lumbar spine, history of hypertension and atypical chest pain, she was not disabled

by her impairments. (R. 22-30.) The Appeals Council denied Plaintiff's request for review, rendering the ALJ's decision the Commissioner's final decision. (R. 1-7.) On May 10, 2013, Plaintiff filed the instant appeal to this Court. (Doc. 1.) On appeal, Plaintiff raises two issues: (1) whether Plaintiff's right to a fair hearing was violated because the ALJ was not a neutral factfinder; and (2) whether the ALJ erred in assessing the effects of Plaintiff's obesity. (Doc. 17.)

## II. STANDARD OF REVIEW

The Commissioner's findings of fact are conclusive if supported by substantial evidence.[1] Substantial evidence is more than a scintilla, i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.[2]

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.[3] The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.[4]

---

[1] See 42 U.S.C. § 405(g) (2000).

[2] Foote v. Chater, 67 F.3d 1553, 1560 (11th Cir. 1995) (citing Walden v. Schweiker, 672 F.2d 835, 838 (11th Cir. 1982) and Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 28 L. Ed. 2d 842 (1971)); accord, Edwards v. Sullivan, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

[3] Edwards, 937 F.2d at 584 n.3; Barnes v. Sullivan, 932 F.2d 1356, 1358 (11th Cir. 1991).

[4] Foote, 67 F.3d at 1560; accord, Lowery v. Sullivan, 979 F.2d 835, 837 (11th Cir. 1992) (holding that the court must scrutinize the entire record to determine reasonableness of factual findings); Parker v. Bowen, 793 F.2d 1177 (11th Cir. 1986) (finding that the court also must consider evidence detracting from

However, the district court will reverse the Commissioner's decision on plenary review if the decision applies incorrect law, or if the decision fails to provide the district court with sufficient reasoning to determine that the Commissioner properly applied the law.[5]

The law defines disability as the inability to do any substantial gainful activity by reason of any medically determinable physical or mental impairment that can be expected to result in death, or has lasted or can be expected to last for a continuous period of not less than twelve months.[6] The impairment must be severe, making Plaintiff unable to do his previous work, or any other substantial gainful activity which exists in the national economy.[7]

The burden of proof regarding the plaintiff's inability to perform past relevant work initially lies with the plaintiff.[8] The burden then temporarily shifts to the Commissioner to demonstrate that "other work" which the claimant can perform currently exists in the national economy.[9] The Commissioner may satisfy this burden

---

evidence on which the Commissioner relied).

[5] Keeton v. Dep't Health and Human Servs., 21 F.3d 1064, 1066 (11th Cir. 1994).

[6] 42 U.S.C. §§ 416(i), 423(d)(1); 20 C.F.R. § 404.1505 (2005) (All further references to 20 C.F.R. will be to the 2005 version unless otherwise specified.).

[7] 42 U.S.C. § 423(d)(2); 20 C.F.R. §§ 404.1505-404.1511.

[8] Walker v. Bowen, 826 F.2d 996, 1002 (11th Cir. 1987); see also Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001).

[9] Doughty, 245 F.3d at 1278 n.2. In Doughty the court explained this burden shifting as follows:

> In practice, the burden temporarily shifts at step five to the Commissioner. The Commissioner must produce evidence that there is other work available in significant numbers in the national economy that the claimant has the capacity to perform. In order to be considered disabled, the claimant must then prove that he is unable to perform the jobs that the Commissioner lists. The temporary shifting of the burden to the Commissioner was initiated by the courts, and is not specifically provided for in the statutes or regulations.) (Internal citations omitted).

*Case No. 1:13-cv-89-MP-GRJ*

by pointing to the Medical-Vocational Guidelines (the "Grids") for a conclusive determination that a claimant is disabled or not disabled.[10]

However, the ALJ should not exclusively rely on the Grids when "the claimant has a non-exertional impairment which significantly limits his or her basic work skills or when the claimant cannot perform a full range of employment at the appropriate level of exertion."[11] In a situation where both exertional and non-exertional impairments are found, the ALJ is obligated to make specific findings as to whether they preclude a wide range of employment.[12]

The ALJ may use the Grids as a framework to evaluate vocational factors so long as he introduces independent evidence of the existence of jobs in the national economy that the claimant can perform.[13] Such independent evidence may be introduced by a Vocational Expert's ("VE") testimony, but this is not the exclusive means of introducing such evidence.[14] Only after the Commissioner meets this burden does the burden shift back to the claimant to show that he or she is not capable of performing the "other work" as set forth by the Commissioner.

---

[10] Walker, 826 F.2d at 1002 ("[T]he grids may come into play once the burden has shifted to the Commissioner to show that the claimant can perform other work.").

[11] Wolfe v. Chater, 86 F.3d 1072, 1077 ( 11th Cir. 1996). See Jones v. Apfel, 190 F.3d 1224, 1229 (11th Cir. 1999); Walker, 826 F.2d at 1003 ("The grids may be used only when each variable on the appropriate grid accurately describes the claimant's situation.").

[12] Walker, 826 F.2d at 1003.

[13] Wolfe, 86 F.3d at 1077-78.

[14] See id.

## III.  SUMMARY OF THE RECORD

### A. Medical Record Evidence

Because Plaintiff's arguments on appeal focus on the effects of her obesity and its impact on her osteoarthritis and rheumatoid arthritis, the Court's summary will focus on the medical records that are relevant to those impairments.  Plaintiff's medical records disclose notations by her doctors of a positive rheumatoid factor as far back as February 25, 2008. Before Plaintiff's alleged onset date and prior to her move to Gainesville Plaintiff was treated by Dr. Adam Barron and Dr. Renanit Barron of Rheumatology and Endocrinology Specialists of the Palm Beaches, P.A . (R. 334-35.)

On July 6, 2009, Dr. Adam Barron, noted that Plaintiff had right ankle pain and swelling for five days, and right knee pain since the day before.  Plaintiff had morning stiffness in her right ankle and knee for around 30 minutes.  Dr. Barron diagnosed Plaintiff with rheumatoid arthritis with a positive rheumatoid factor, and mild left knee osteoarthritis.  He prescribed methotrexate to help her symptoms and to prevent joint damage.  He also performed right ankle aspiration and a depomedrol injection.  X-rays were performed, which were generally unremarkable.  Plaintiff weighed 255.8 pounds at the time she was seen. (R. 317-18; 341.)

Plaintiff began treating with Dr. Rozboril on August 10, 2009, after she relocated to Gainesville.  In her new patient history, Dr. Rozboril noted that Plaintiff had morning stiffness in her joints for fifteen minutes.  He diagnosed Plaintiff with rheumatoid arthritis and prescribed methotrexate.  Plaintiff weighed 257 pounds when she began treating with Dr. Rozboril.  (R. 405-06; 470-73.)  Plaintiff returned to Dr. Rozboril regularly –

about every six weeks –  for followup.

Plaintiff's next appointment was September 29, 2009.  Plaintiff reported that her pain had improved with methotrexate, although her right knee was hurting more.  Dr. Rozboril noted that Plaintiff's right knee had a small fluid wave, and that there was "trouble" with full extension of the knee.  Dr. Rozboril continued methotrexate.  Plaintiff's weight was 255 pounds.  (R. 469.)

Plaintiff's next appointment was November 9, 2009.  She reported that she was not doing well, and had persistent pain and stiffness in her hands.  Her morning stiffness was lasting for a few hours, her pain was waking her at night, and she stated that she needed help with her activities of daily living.  Dr. Rozboril increased methotrexate from ten milligrams to fifteen milligrams, and increased prednisone to ten milligrams for a few weeks.  He noted that her weight had increased to 259 pounds.  (R. 468.)

On November 19, 2009, state agency physician Terri Johnson, opined that Plaintiff retained the ability to lift/carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for six hours each during an eight-hour workday; and perform unlimited pushing and/or pulling consistent with her lifting/carrying abilities.  Dr. Johnson also opined that Plaintiff should be limited to climbing ramps or stairs occasionally and never ladders, ropes, or scaffolds, and should also be limited to occasional balancing.  Plaintiff's history revealed no manipulative, visual, or communicative limitations. Dr. Johnson opined that Plaintiff should avoid concentrated exposure to extreme heat, cold, and hazards, but otherwise had no environmental

restrictions.  (R. 410-417.)

On December 18, 2009, Plaintiff had a physical with Dr. Karen Shannon at Gainesville Family Physicians.  Dr. Shannon reported that Plaintiff was feeling well with no complaints.  Dr. Shannon noted that Plaintiff had recently contracted diabetes due to taking prednisone.  A bone density report indicated that Plaintiff had osteoporosis in her spine.  Plaintiff weighed 259 pounds at the time of her appointment.  (R. 420-425.)

Plaintiff's next appointment with Dr. Rozboril was on December 23, 2009.  She stated that her morning stiffness was now lasting for an hour.  Dr. Rozboril noted that her right knee had a small fluid wave, no crepitus, and was tender medially.  Her ankles were +1/+1.  Her right knee was aspirated and injected with depomedrol.  Dr. Rozboril noted that Plaintiff now needed to stay off prednisone because of her recent onset diabetes.  Plaintiff's weight was 258 pounds.  (R. 467.)

Plaintiff returned on February 5, 2010.  She reported that the steroid shot in her right knee helped a lot, but her ankle was now hurting.  Dr. Rozboril noted that her right knee popped with her range of motion.  Her weight was then 257 pounds.  (R. 466.)

On March 1, 2010, state agency physician Thomas Peele, M.D., opined that Plaintiff retained the ability to lift/carry 20 pounds occasionally and 10 pounds frequently; stand, walk, and sit for six hours each during an eight-hour workday; and perform unlimited pushing and/or pulling consistent with her lifting/carrying abilities.  Dr. Peele also opined that Plaintiff should be limited to climbing ramps, stairs, ladders, ropes, or scaffolds occasionally, and should also be limited to occasional stooping and crouching.  Plaintiff's history revealed no manipulative, visual, or communicative

limitations. Dr. Peele opined that Plaintiff should avoid concentrated exposure to hazards, but otherwise had no environmental restrictions. (R. 443-50.)

Plaintiff returned to Dr. Rozboril on March 8, 2010. She had a flare up of her right knee and ankle pain, but had taken some prednisone and was feeling much better. Her pain was no longer waking her at night. Dr. Rozboril adjusted the prednisone, and also noted that Plaintiff was applying for disability. She weighed 252 pounds. (R. 465.)

Her next office visit was April 20, 2010. Plaintiff was using prednisone daily, which helped her pain, and her right knee was better. (R. 464.) Plaintiff returned on June 3, 2010, stating that her hands were now bothering her the most. Dr. Rozboril gave Plaintiff her first injection of Humira. She weighed 258 pounds at this appointment. (R. 463.)

Plaintiff's next appointment was August 13, 2010. She stated that her rheumatoid arthritis was hurting her more now that she was off her medications. She had stopped taking the medications until she was able to get a lymph node biopsy, which had not been scheduled. Plaintiff's knees had no fluid wave. Plaintiff was prescribed prednisone. (R. 462.)

Plaintiff returned to Dr. Rozboril on September 16, 2010. She reported morning stiffness for twenty minutes. Dr. Rozboril noted that Plaintiff had been going to Curves and walking, and that she needed no assistance with her activities of daily living. Dr. Rozboril assessed her right ankle as 2+/2+, and noted her knees had no fluid wave. Dr. Rozboril put Plaintiff back on methotrexate. Plaintiff weighed 260 pounds at the time of her appointment. (R. 461.)

On November 4, 2010, Plaintiff reported morning stiffness for half an hour, and that her pain was waking her at night. Dr. Rozboril noted that Plaintiff's right knee had a small fluid wave, and her right knee was 2+/2+. Dr. Rozboril diagnosed her with rheumatoid arthritis, and osteoarthritis in her knee. Dr. Rozboril noted that Plaintiff planned to lose the weight that she had gained – she weighed 266 pounds at this appointment, 6 more pounds than her previous appointment. (R. 460.)

### B. Hearing Testimony

A board-certified internist with a sub-specialty in rheumatology, Dr. Robert Karsh, M.D., testified as a medical expert at the hearing at the ALJ's request. Dr. Karsh reviewed Plaintiff's medical records. He noted that Plaintiff had some osteoporosis, which was damaging her bones, and attributed it to post-menopausal changes. He noted her type-II diabetes, and that it was well controlled with no complications. He stated that Plaintiff had some osteoarthritis, mostly in her knees, but observed that Plaintiff had not needed any assistance in ambulation. Dr. Karsh also noted Plaintiff's "well-documented" diagnoses of rheumatoid arthritis, but noted that there were differences in the record with respect to her rheumatoid arthritis. He explained that "in other words, we have a diagnoses, but it does not seem to be causing functional problems as of 3/31/08 and 5/4/09." Dr. Karsh noted that Plaintiff's OB/GYN, who was aware of Plaintiff's rheumatoid arthritis, noted in Plaintiff's medical records that Plaintiff had "no complaints" on 12/8/09. Dr. Karsh also pointed to the findings in Plaintiff's medical records of 8/10/09, which showed in the right wrist and metacarpal phalangeal joint one plus to the right, and explained that one plus was "minimal" in arthritis. He

also noted one plus in the right ankle and the metatarsal phalangeal joint.   (R. 37-43.)

Dr. Karsh then discussed a later entry in Plaintiff's records, on 11/4/10, where she was seen for a followup for her rheumatoid arthritis.  There was some swelling of the right knee, and the ankle was two plus swollen and two plus tender.  The right wrist had a slight decrease in motion, and there was a chronic thickening of the metacarpophalangeal proximal interphalangeal joints, in the hand.  Dr. Karsh noted that her right knee was drained and injected, but that Plaintiff's physician opined that the problem in her knee was probably osteoarthritis rather than rheumatoid arthritis.  Thus, Dr. Karsh opined that although Plaintiff' "has activity in her rheumatoid arthritis," there was no joint deformity, and the rheumatoid arthritis was "not severe."  (R. 43-45.)

Dr. Karsh opined that Plaintiff's impairments did not meet or equal any listings. Dr. Karsh noted that there were two separate residual functional capacity (RFC) assessments, one on 11/19/09, and another one 3/1/10.  Dr. Karsh testified that he agreed with the RFC assessments that Plaintiff could occasionally carry twenty pounds and much of the time handle ten pounds, she could stand for six hours in an eight-hour day, sit six hours in an eight-hour day, with some limitations on stooping, crouching, kneeling, and in hazardous heights.  He affirmed that he agreed with the findings of the RFC assessments even taking into consideration Plaintiff's obesity.  He then clarified Plaintiff should be limited to no hazards, including no climbing ladders, ropes, and scaffolds, and limiting crouching, kneeling and crawling to only occasional.  Dr. Karsh saw no problem with Plaintiff balancing frequently, and also he did not believe Plaintiff had any limitation on her ability to reach in all directions, handle, finger, and feel either

from a fine or gross exterior standpoint within the weight limitations. Thus, Dr. Karsh agreed that after taking into account all of the credible medical evidence Plaintiff could perform a reduced range of light work. (R. 45-49.)

Upon examination by Plaintiff's representative, Dr. Karsh admitted that he was aware that the physicians who completed the RFC assessments had never examined Plaintiff. (R. 50-58.)

Plaintiff testified that she was 54 years old at the time of the hearing, and had completed one and a half years of college in elementary education. Plaintiff had a driver's license, and had worked as recently as the day before the hearing. She had been working as a substitute teacher at a daycare facility since January of 2011.

Plaintiff had worked at Winn-Dixie as a general merchandise manager for 30 years, from 1979 until July of 2009. As a general merchandise manager, Plaintiff testified that she stocked up her section, blocked it, and completed orders for the section, which was mostly the health and beauty aides, as well as housewares. The job involved a lot of lifting and squatting on her knees while placing the merchandise on the shelves. She testified she was on her feet the entire day. Plaintiff stated that the heaviest amount she had to lift or carry was fifty or sixty pounds. She was required to unload pallets off of trucks using a power jack, and then would have to get the merchandise off the pallet herself. At times, Plaintiff was responsible for supervising two people. Plaintiff testified that she retired from her position with Winn-Dixie in July 2009, because she relocated to Gainesville and because she could no longer do the work that she used to do. (R. 59-63.)

Plaintiff testified that she began to see Dr. Rozboril in 2009 after she relocated to Gainesville.  She saw him every six weeks, and did blood work at his office.   Plaintiff also testified that she went to Gainesville Family Physicians for her primary care, but now had a new primary care physician, Dr. Kiona Subramenian.  Plaintiff said that she saw Dr. Subramenian about every six months for primary care. Dr. Subramenian treated Plaintiff for high blood pressure and high cholesterol.  Plaintiff also saw Dr. Chauhan, an endocrinologist, for her diabetes.  Plaintiff testified that she took an oral medication for her diabetes and did blood sugar readings every day.  (R. 63-68.)

Plaintiff testified that she had gained about twenty pounds since she retired from Winn-Dixie, but she was trying to do exercises at Curves, where she had a membership.  She testified that sometimes her pain would not allow her to go, and she had not been for a couple of months.  Plaintiff stated that she was taking prednisone, and that she had noticed a beneficial effect from it.  She also was taking methotrexate and Humira injections for her arthritis, and Fosamax for her osteoporosis.  She said the medication made her fatigued, and that she would shake so badly when she took her medication that she would have to sit down. (R. 68-73.)

Plaintiff states that she could sit for an hour and a half or two hours before she needed to take a stretch break, could stand thirty minutes but would need to lean on something because her back would hurt, and could probably walk for about a block and a half before she would need to stop because her ankles and right knee would hurt.  (R. 73-74.)

Plaintiff lived with her two adult daughters, and had her own room in the home.

Plaintiff's young grandson also lived in the home.  When his mother worked, her grandchild would go to a babysitter, but Plaintiff would also do some of the babysitting if they were in the same house at the same time.  Her daughters worked during the day so Plaintiff was generally home by herself.  During the day, Plaintiff would get up, brush her teeth, and sometimes vacuum.  She would take a break from vacuuming and watch television, and could do a load of laundry.  She could take things out of the freezer to cook, but could not cook anything that required her to use a knife, like cutting up cabbage or chicken.  Plaintiff runs errands in the car twice a week, attends church once a week and reads her Bible.  (R. 74-82.)

Plaintiff testified that after she retired from Winn-Dixie until the time she began work as a substitute teacher she did not apply for any other jobs.  She stated that she saw this job in the newspaper and decided to apply for it.  She stated that when she was caring for the three and four year-olds at the daycare facility there was some standing and walking, but she had a chair in which she could sit down, or could lean against a wall.  She testified that she did not have to lift toddlers or infants.  (R. 82-83.)

Upon examination from her representative, Plaintiff stated that she had severe pain at least four to five days a week, and rated her knee pain a seven or an eight on a ten-point scale.  Plaintiff rated her ankle pain as an eight or nine on a ten-point scale. She stated that her pain was worse on cloudy days, and if it took a while for her pain medication to take effect, she would lie in her bed.  (R. 83-89.)

A vocational expert (VE) also testified at the hearing.  The VE testified that Plaintiff past relevant work was as a store keeper, a heavy job with an SVP of 4.   The

ALJ posed a hypothetical individual the same as Plaintiff, with the same educational background and past work experience, who could sit, stand and walk for at least six hours in an eight-hour workday, lift twenty pounds for one-third of the day and ten pounds more frequently, occasionally climb ramps or stairs, but no climbing of ropes, ladders, and scaffolds, and occasionally stoop, kneel, crouch, and crawl, and no work around unprotected heights or around moving machinery.  The VE testified that such an individual could not perform Plaintiff's past relevant work as actually performed or as customarily performed.  However, the VE testified that there were light jobs available in the national and regional economies, including jobs such as office helper, mail order, and ticket seller that Plaintiff could perform.  Further, the VE stated that Plaintiff could perform the job of industrial order clerk, a sedentary job and could perform the job of dining room attendant, an unskilled, light job.  The VE noted that the ticket seller job allowed for an at-will sit/stand option, as did the mail sorter, but that was not at-will.  (R. 83-98.)

    C.  **ALJ's Decision**

The ALJ determined that Plaintiff met the insured status requirements through December 31, 2013, and had not engaged in substantial gainful activity since July 16, 2009, her alleged onset date.  He determined that Plaintiff had the severe impairments of history of arthralgias, history of osteoporosis of the lumbar spine, history of hypertension and atypical chest pain, but did not have an impairment or combination of impairments that met or equaled the Listings.  The ALJ determined that Plaintiff had the RFC to perform a light work as defined in 20 CFR 404.1567(B), except that she was

limited to lifting and carrying twenty pounds occasionally and ten pounds or less more frequently, and could sit, stand, or walk for six hours each in an eight-hour day. She could occasionally claim ramps and stairs, but could never climb ropes, ladders, or scaffolds. She could occasionally stoop, kneel, crouch, and crawl, but could not perform tasks at unprotected heights or around moving machinery. In making this determination, the ALJ partially credited Plaintiff's complaints regarding the disabling effects of her medically determinable impairments, but found that Plaintiff's complaints were not fully credible. The ALJ accorded "greater" weight to Dr. Karsh's opinion and physical assessment of Plaintiff's abilities and also accorded "some" weight to the state agency evaluator's opinion and physical assessment to the extent they were consistent with the ALJ's RFC assessment. The ALJ concluded that Plaintiff was unable to perform her past relevant work, but considering the Plaintiff's age, education, work experience, and RFC, there are jobs that exist in the national economy that she could perform. These include the positions of office helper, mail sorter, ticket seller, industrial order clerk, and dining room attendant. The ALJ, therefore, concluded that Plaintiff was not disabled. (R. 22-30.)

## IV. DISCUSSION

**Claim 1:** *ALJ's Asserted Lack of Neutrality*

Plaintiff contends that this case should be remanded because Plaintiff was denied a full and fair hearing before the ALJ because the ALJ was not a "neutral fact finder," which violated her Fifth Amendment right to due process. As support for this argument, Plaintiff points to data purporting to show that the ALJ who denied Plaintiff's

claim in this case, ALJ John D. Thompson, has a statistically lower-than-average rate of favorable disability rulings compared with the statewide average and national average. Specifically, Plaintiff asserts that "ALJ Thompson only issues Favorable Decisions in 14 or 15 percent of his cases versus the statewide average of 63%."" Doc. 17 at 26.[15]

A Social Security claimant is entitled to a full and fair hearing and the Eleventh Circuit has held that an ALJ shall not conduct a hearing if he or she is prejudiced with respect to a party to a case or has any interest in the outcome of the pending matter. *Miles v. Chater*, 84 F.3d 1397, 1401(11th Cir. 1996) (*citing* 20 C.F.R. § 404.940). The court there noted the crucial role the ALJ plays in the disability review process, stating that "[n]ot only is he duty-bound to develop a full and fair record, he must carefully weigh the evidence, giving individualized consideration to each claim that comes before him." *Id.* The ALJ's impartiality is integral to the system. *Id.*

The Social Security regulations require that the claimant present a claim of bias at the earliest opportunity. *Miles*, 84 F.3d at 1400. The claimant must notify the ALJ if she objects to the assignment of a particular ALJ to her case. If the ALJ refuses to withdraw, the claimant must seek reconsideration after the hearing by raising the issue before the Appeals Council. *Id.* "A claim of bias is waived if the claimant is aware of the facts giving rise to his bias claim, but fails to raise it in accordance with 20 C.F.R. §§ 404.940, 416.1440." *Stokes v. Astrue* 2009 WL 2216785, *14 (M.D.Fla. 2009) (citing *Hummel v. Heckler*, 736 F.2d 91, 94 (3d Cir.1984)).

---

[15]The statistics relied upon by Plaintiff are compiled in the following spreadsheet: https://docs.google.com/spreadsheet/pub?key=0AsvjxcmAioZldGM2ZDJZQlZzaF9KZDBUS3FCRDdVd1E&gid=1

The record does not reflect, and Plaintiff does not assert, that she challenged the ALJ's impartiality during the administrative proceedings. The statistics relied upon by Plaintiff in her appellate argument are not part of the administrative record in this case. Plaintiff points to nothing in the record of her administrative proceedings that suggests that the ALJ was biased in deciding her disability claim, nor does the Court's review of the record reflect such bias. While the statistics relied upon by Plaintiff may merit scrutiny by the Commissioner, it is not the province of this Court to make factual determinations regarding the relevance of such statistics to Plaintiff's disability claim in the first instance. Moreover, statistical evidence regarding an ALJ's claim denial rate is generally insufficient to establish bias, in the absence of other evidence reflecting actual bias on the part of the ALJ. *See, e.g., Grant v. Comm'r of Soc. Sec.*, 111 F. Supp. 2d 556, 558-59 (M.D. Pa. 2000) ("[S]tatistics in and of themselves may have limited probative value," but other evidence in the record, including statements by the ALJ evincing bias, supported plaintiffs' bias claim.)

On this record, the Court concludes that because Plaintiff did not raise this bias claim during the administrative proceedings and there is no other evidence of bias apparent from the record, the claim of bias based on the ALJ's disability ruling statistics is waived and foreclosed from review by this Court. *See Hummel*, 736 F.2d at 94.

**Claim 2:** *ALJ's Assessment of Plaintiff's Obesity*

Plaintiff contends that the ALJ failed to properly follow Social Security Ruling 02-1p in finding that Plaintiff could perform light duty work, and thus is not disabled. Social Security Ruling 02-1p guides the evaluation of obesity in disability claims, and was

published following the deletion of Listing 9.09, Obesity, from the Listing of Impairments. *See* 67 Fed. Reg. 57859, 57860-61 (Sept. 12, 2002). The SSR recognizes that obesity is a risk factor that increases the chance of developing impairments in other body systems, including the cardiovascular, respiratory, and musculoskeletal body systems. *Id*. The SSR provides that the ALJ should consider the effect of obesity at each step of the sequential evaluation:

> [T]he combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately.... [A]djudicators [should] consider the effects of obesity not only under the listings but also when assessing a claim at other steps of the sequential evaluation process, including when assessing an individual's residual functional capacity.

*Id*. at 57861-62.

Plaintiff asserts that the ALJ failed to "realistically evaluate the increased knee pain that would be concomitant with Plaintiff Barry's morbid obesity" in determining Plaintiff's RFC at Step Four, and argues that this case should be remanded with directions to the Commissioner to instruct the ALJ to follow Social Security Ruling 02-1p. (Doc. 17.)

The ALJ did not find Plaintiff's obesity was a severe impairment at step two of the sequential analysis. The ALJ expressly stated, however, that:

> The claimant is obese. Though this impairment is not a "listed" impairment, the effect that this condition had on the claimant's overall ability to perform work related functions, either singly or in combination with other impairments, had been considered in accordance with SSR 02-1p. (R. 25.)

Further, in evaluating Plaintiff's RFC at step four, the ALJ noted that Dr. Karsh, a

specialist in internal medicine and rheumatology. whose opinion the ALJ gave "greater" weight, had considered Plaintiff's impairments with her obesity, and opined that Plaintiff could perform a reduced range of light work.  (R. 28.)  The ALJ concluded that the treating source statements describing Plaintiff's physical condition provided support for Dr. Karsh's assessment of Plaintiff's functional abilities.  (R. 27-28.)

The ALJ also discussed Plaintiff's medical records in detail, including a discussion of her knee pain, rheumatoid arthritis, and osteoarthritis.  The ALJ's RFC determination accounted for Plaintiff's obesity and her other impairments by limiting Plaintiff to light work with additional postural and environmental limitations.  (R. 25.)

Accordingly, the Court concludes that the ALJ fully and properly considered Plaintiff's obesity, and the functional limitations arising therefrom, in combination with Plaintiff's other impairments in evaluating her RFC.  As such, Plaintiff's argument that the ALJ erred by failing to address Plaintiff's obesity as required by the Social Security Ruling has no merit.

## VII.  RECOMMENDATION

In view of the foregoing, it is respectfully **RECOMMENDED** that the decision of the Commissioner should be **AFFIRMED**.

**IN CHAMBERS,** in Gainesville, Florida, on the 28th day of May 2014.

*s/ Gary R. Jones*
GARY R. JONES
United States Magistrate Judge

## **NOTICE TO THE PARTIES**

**Pursuant to Fed. R. Civ. P. 72(b)(2), a party may file specific, written objections to the proposed findings and recommendations within 14 days after being served with a copy of this report and recommendation.  A party may respond to another party's objections within 14 days after being served with a copy thereof.  Failure to file specific objections limits the scope of review of proposed factual findings and recommendations.**